ROBINSON, J., concurring.
 

 I share the majority's concern about the inherently suggestive nature of first time in-court identifications at criminal trials.
 
 [1]
 
 I am, however, concerned about the majority's election to decide the merits of the
 federal constitutional issues concerning such identifications raised by the defendant, Andrew Dickson, under these circumstances. In my view, this court's analysis more appropriately starts and ends with part V of the majority opinion, which "assume[s] that [the] in-court identification of the defendant [by one of the victims] was improperly admitted," but nevertheless "conclude[s] that any due process
 violation was harmless beyond a reasonable doubt." Given this conclusion, I believe that parts I through IV of the majority opinion appear to be inconsistent with our long held commitment to avoid unnecessarily deciding constitutional issues. See
 
 Moore v. McNamara,
 

 201 Conn. 16
 
 , 20,
 
 513 A.2d 660
 
 (1986). This is particularly troublesome because the state's ultimate victory in this appeal renders the majority's analysis of a complex and controversial issue of federal constitutional law virtually unreviewable under the "usual rule" of the United States Supreme Court in its exercise of its certiorari jurisdiction, which is to deny petitions filed by prevailing parties.
 
 Camreta v. Greene,
 

 563 U.S. 692
 
 , 709,
 
 131 S.Ct. 2020
 
 ,
 
 179 L.Ed.2d 1118
 
 (2011) ; see also
 
 28 U.S.C. § 1257
 
 (a) (providing for certiorari jurisdiction over state court decisions).
 
 [2]
 
 Accordingly, I join only in part V of the majority's opinion and this court's ultimate decision to affirm the judgment of the Appellate Court upholding the defendant's convictions of assault in the first degree in violation of General Statutes § 53a-59 (a)(1), and conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-48 and 53a-134 (a)(4).
 

 It is well settled that "[t]his court has a basic judicial duty to avoid deciding a constitutional issue if a nonconstitutional ground exists that will dispose of the case.... The best teaching of this [c]ourt's experience admonishes us not to entertain constitutional questions in advance of the strictest necessity." (Citations omitted;
 

 internal quotation marks omitted.)
 
 Moore v. McNamara,
 
 supra,
 
 201 Conn. at 20-21
 
 ,
 
 513 A.2d 660
 
 ; see
 
 Parker v. Los Angeles,
 

 338 U.S. 327
 
 , 333,
 
 70 S.Ct. 161
 
 ,
 
 94 L.Ed. 144
 
 (1949) ;
 
 Rescue Army v. Municipal Court,
 

 331 U.S. 549
 
 , 568-74,
 
 67 S.Ct. 1409
 
 ,
 
 91 L.Ed. 1666
 
 (1947) ;
 
 Ashwander v. Tennessee Valley Authority,
 

 297 U.S. 288
 
 , 346-47,
 
 56 S.Ct. 466
 
 ,
 
 80 L.Ed. 688
 
 (1936) (Brandeis, J., concurring). "We do not take lightly our responsibility to act as the final arbiter in resolving issues relating to our constitution.... We also, however, do not engage in addressing constitutional questions unless their resolution is unavoidable." (Citations omitted.)
 
 State v. McCahill,
 

 261 Conn. 492
 
 , 501,
 
 811 A.2d 667
 
 (2002) ; see also
 
 Kinsey v. Pacific Employers Ins. Co.,
 

 277 Conn. 398
 
 , 420-22,
 
 891 A.2d 959
 
 (2006) (
 
 Zarella, J.,
 
 concurring) (collecting authorities). The United States Supreme Court has described this doctrine of constitutional avoidance as "more deeply rooted than any other in the process of constitutional adjudication...." (Internal quotation marks omitted.)
 
 Rescue Army v. Municipal Court,
 

 supra,
 
 at 570 n. 34,
 
 67 S.Ct. 1409
 
 .
 

 This court often applies the doctrine of constitutional avoidance not to decide difficult
 questions of constitutional law when the state has established that any constitutional error will not affect the result of the appeal because it is harmless beyond a reasonable doubt. "Under such circumstances, it would [not be an efficient use of] judicial resources, and a pedantic exercise, to delve deeply into the constitutional merits of a claim that can appropriately be resolved in accordance with the relevant harmless error analysis." (Citations omitted.)
 
 State v. Golding,
 

 213 Conn. 233
 
 , 241-42,
 
 567 A.2d 823
 
 (1989) ; see also
 
 United States v. Hasting,
 

 461 U.S. 499
 
 , 509,
 
 103 S.Ct. 1974
 
 ,
 
 76 L.Ed.2d 96
 
 (1983). For example, in
 
 State v. Jordan,
 

 314 Conn. 89
 
 , 96,
 
 101 A.3d 179
 
 (2014), the defendant raised a complex challenge
 to the seizure of drugs from a closet near where he was arrested under the fourth amendment to the United States constitution. See id., at 96-98,
 
 101 A.3d 179
 
 (noting questions over scope of
 
 Arizona v. Gant,
 

 556 U.S. 332
 
 ,
 
 129 S.Ct. 1710
 
 ,
 
 173 L.Ed.2d 485
 
 [ (2009) ], with respect to searches incident to arrest under
 
 Chimel v. California,
 

 395 U.S. 752
 
 ,
 
 89 S.Ct. 2034
 
 ,
 
 23 L.Ed.2d 685
 
 [ (1969) ] ). Observing the "unsettled" nature of the law in this area given a "split" among the federal courts, this court "conclude[d] that the present case does
 
 not
 
 require us to weigh in on this debate. Even if we assume, without deciding, that the facts and the law should have led the trial court to suppress the evidence seized from the closet, we are fully convinced that any improper admission of the evidence is harmless beyond a reasonable doubt in light of the unchallenged evidence seized from the defendant's person." (Emphasis added.)
 
 State v. Jordan,
 
 supra, at 100-101,
 
 101 A.3d 179
 
 .
 

 Identification cases like the present case are no exception to the doctrine of constitutional avoidance. Recently, in
 
 State v. Artis,
 

 314 Conn. 131
 
 , 145,
 
 101 A.3d 915
 
 (2014), this court declined to consider a constitutional challenge to the reliability of an out-of-court identification that the state had conceded "was unnecessarily suggestive," because, "even if [the] identification testimony should have been suppressed, the state's use of that testimony is subject to harmless error review, and the state has proven beyond a reasonable doubt that the admission of the testimony was harmless." See also id., at 155-56,
 
 101 A.3d 915
 
 (overruling
 
 State v. Gordon,
 

 185 Conn. 402
 
 ,
 
 441 A.2d 119
 
 [ (1981) ], cert. denied,
 
 455 U.S. 989
 
 ,
 
 102 S.Ct. 1612
 
 ,
 
 71 L.Ed.2d 848
 
 [ (1982) ], and concluding that use of unreliable eyewitness identification resulting from unnecessarily suggestive procedure is not structural error and, therefore, subject to harmless error review). The majority opinion and Justice Zarella's concurring opinion comprehensively explore
 the divergent approaches taken by the United States Circuit Courts of Appeal and our sister states with respect to first time in-court identifications, and I need not repeat them here. Suffice it to say, given the deep division in the law in this area, I would follow the doctrine of constitutional avoidance, as exemplified by our recent decisions in
 
 Artis
 
 and
 
 Jordan,
 
 and not weigh in on the difficult federal constitutional issue in this case, in which the claimed due process violation is ultimately harmless error.
 
 [3]
 
 Further weighing in favor of restraint is the fact that we already have a controlling precedent,
 
 State v. Smith,
 

 200 Conn. 465
 
 , 469,
 
 512 A.2d 189
 
 (1986), which the majority overrules in part I of its opinion. That the majority's constitutional analysis implicates stare decisis
 
 [4]
 
 is even more reason that we should be reticent to resolve the defendant's federal constitutional claims. That doctrine "counsels that a court should not overrule its earlier decisions unless the most cogent reasons and inescapable logic require it.... Stare decisis is justified because it allows for predictability in the ordering of conduct, it promotes the necessary perception that
 the law is relatively unchanging, it saves resources and it promotes judicial efficiency.... It is the most important application of a theory of decisionmaking consistency in our legal culture and ... is an obvious manifestation of the notion that decisionmaking consistency itself has normative value." (Internal quotation marks omitted.)
 
 State v. Artis,
 
 supra, 314 Conn. at 146,
 
 101 A.3d 915
 
 .
 

 The majority, however, supports its decision to overrule
 
 Smith
 
 and impose a constitutionally based prophylactic rule with respect to first time in-court identifications by observing that the United States Supreme Court "has the authority to overrule our decision" should it disagree with this court's resolution of the constitutional issue.
 
 [5]
 
 See footnote 11 of the majority opinion. I respectfully disagree with the majority's reliance on the United States Supreme Court's certiorari
 process as a safety net for its interpretation of the federal due process clause given the posture of this case, wherein the state ultimately prevails entirely by obtaining an affirmance of the defendant's
 convictions, albeit on harmless error grounds. This is because it is well settled that the "usual rule" of the United States Supreme Court is not to "[consider] prevailing parties' petitions [for writs of certiorari]" and, thus, that court would not be able to review the majority's analysis of the constitutional issue in the present case.
 
 Camreta v. Greene,
 
 supra,
 
 563 U.S. at 709
 
 ,
 
 131 S.Ct. 2020
 
 .
 

 Although the United States Supreme Court is not precluded constitutionally or statutorily from granting a petition filed by a prevailing party,
 
 [6]
 
 it has stated that its "resources are not well spent superintending each word a lower court utters en route to a final judgment in the petitioning party's favor." Id., at 704,
 
 131 S.Ct. 2020
 
 . The court, "therefore [has] adhered with some rigor to the principle that [t]his [c]ourt reviews judgments, not statements in opinions." (Internal quotation marks omitted.) Id.; see also
 
 Bunting v. Mellen,
 

 541 U.S. 1019
 
 , 1023,
 
 124 S.Ct. 1750
 
 ,
 
 158 L.Ed.2d 636
 
 (2004) (Scalia, J., dissenting from denial of certiorari) ("although the statute governing
 our certiorari jurisdiction permits application by 'any party' to a case in a federal court of appeals ... our practice reflects a 'settled refusal' to entertain an appeal by a party on an issue as to which he prevailed"). "On the few occasions when we have departed from that principle, we have pointed to a policy reaso[n] ... of sufficient importance to allow an appeal by the winner below." (Internal quotation marks omitted.)
 
 Camreta v. Greene,
 
 supra,
 
 563 U.S. at 704
 
 ,
 
 131 S.Ct. 2020
 
 . I suggest that the United States Supreme Court's reviewability precedents disclose no such policy reason that would allow certiorari review in this otherwise routine criminal appeal.
 
 [7]
 
 Particularly instructive on this point is
 
 California v. Rooney,
 

 483 U.S. 307
 
 ,
 
 107 S.Ct. 2852
 
 ,
 
 97 L.Ed.2d 258
 
 (1987) (per curiam). In that case, the United States Supreme Court "granted the [s]tate's petition for certiorari to decide whether [the] respondent retained an expectation of privacy in a bag that he placed in the communal trash bin of a multi-unit apartment building," despite the fact that the state had prevailed entirely before a state appellate court, which had determined
 that there was sufficient other evidence beyond the trash bin search to support probable cause for the challenged warrant.
 
 Id., at 308-11
 
 ,
 
 107 S.Ct. 2852
 
 . Ultimately, the United States Supreme Court dismissed the appeal as improvidently granted, reasoning that the challenged "judgment ... was entirely in the [s]tate's favor-the search warrant which was the sole focus of the litigation was deemed valid. The fact that the [state appellate court] reached its decision through analysis different than this [c]ourt might have used does not make it appropriate for this [c]ourt to rewrite the [state appellate] court's decision, or for the prevailing party to request us to review it. That the [state appellate court] even addressed the trash bin issue is mere fortuity; it could as easily have held that since there was sufficient evidence to support the search even without the trash evidence, it would not discuss the constitutionality of the trash search.
 
 The [state appellate court's] use of analysis that may have been adverse to the [s]tate's long-term interests does not allow the [s]tate to claim status as a losing party for purposes of this [c]ourt's review.
 
 " (Emphasis added.)
 
 Id., at 311
 
 ,
 
 107 S.Ct. 2852
 
 .
 

 Rooney
 
 suggests, then, that it is extraordinarily unlikely that the Supreme Court would grant certiorari to consider any challenge by the state to the majority's resolution of the merits of the defendant's federal constitutional claim. The ultimate judgment of the United States Supreme Court would have no practical effect whatsoever on the judgment of this court affirming the defendant's convictions. Thus, given the majority's conclusion in part V of its opinion that the state has proven any identification error in this case harmless beyond a reasonable doubt, I do not think it advisable to rely on the prospect of the United States Supreme Court's review to encourage us to go out on a federal constitutional limb with respect to the complex constitutional
 issue presented by the merits of the defendant's challenge to his first time in-court identification.
 
 [8]
 
 Accordingly, I join in the judgment of the court.
 

 I adopt the majority's terminology in that I use "first time in-court identification" to refer to instances "in which the witness has not successfully identified the defendant in a prior out-of-court identification procedure"; footnote 3 of the majority opinion; either because the witness did not have such opportunity or had the opportunity but nonetheless was unable to identify the defendant.
 

 In this opinion, I use the word "nonsuggestive" as the majority does, namely, to refer to an identification procedure that is not unnecessarily suggestive. See footnote 2 of the majority opinion. I also note that the majority does not-nor could it-overrule our existing case law regarding the admissibility of evidence of out-of-court identifications or in-court identifications that follow successful out-of-court identifications. Thus, if the nonsuggestive out-of-court identification required by the rule that the majority announces today is in fact an unnecessarily suggestive identification, a subsequent in-court identification is not necessarily inadmissible. Instead, the admissibility of such an identification will be determined by applying our current two-pronged test: "[F]irst, it must be determined whether the identification procedure was unnecessarily suggestive; and, second,
 
 if it is found to have been so,
 
 it must be determined whether the identification was nevertheless reliable based on examination of the totality of the circumstances." (Internal quotation marks omitted.)
 
 State v. Revels,
 

 313 Conn. 762
 
 , 771,
 
 99 A.3d 1130
 
 (2014), cert. denied, --- U.S. ----,
 
 135 S.Ct. 1451
 
 ,
 
 191 L.Ed.2d 404
 
 (2015).
 

 Notwithstanding my conclusion that the constitution does not require the prophylactic rule adopted by the majority, I would not join the majority opinion in the present case because the parties have not had the opportunity to brief the issue of whether to adopt such a rule, and, therefore, the ramifications of this new rule may not be fully appreciated.
 

 It would be imprudent for this court to create constitutional rules on the basis of evolving social science. Moreover, the social science regarding eyewitness identifications is not only evolving but
 
 revolving.
 
 For example, for years, law enforcement personnel utilized simultaneous identification procedures. Then, in 2012, the legislature required that all photographic arrays and live lineups be presented sequentially; see Public Acts 2012, No. 12-111, § 1, codified at General Statutes (Rev. to 2013) § 54-1p (c)(1) ; and this court recognized in
 
 State v. Guilbert,
 

 306 Conn. 218
 
 ,
 
 49 A.3d 705
 
 (2012), that the consensus among social scientists and courts was that sequential identification procedures are more reliable than simultaneous procedures. See id., at 237-38,
 
 49 A.3d 705
 
 . Recently, however, some studies again favor the use of simultaneous lineups. See, e.g.,
 
 United States v. Johnson,
 

 745 F.3d 227
 
 , 229 (7th Cir.2014) (noting that resent research "has called into question" view that sequential photographic identification procedures are superior to simultaneous photographic procedures); National Research Council et al., Identifying the Culprit: Assessing Eyewitness Identification (2014) pp. 83, 86 n. 42 (observing that some recent studies indicate that simultaneous lineups have higher accuracy than sequential lineups and calling for more research). Thus, the federal courts, Congress, and law enforcement personnel should create prophylactic procedures, and this court should limit itself to remedying
 
 actual
 
 constitutional violations.
 

 In place of
 
 Smith,
 
 the defendant suggests three possible alternative approaches. First, the court could review the reliability of first time in-court identifications by utilizing the rules of evidence, as the Oregon Supreme Court did in
 
 State v. Lawson,
 

 352 Or. 724
 
 , 737-39,
 
 291 P.3d 673
 
 (2012), and
 
 State v. Hickman,
 

 355 Or. 715
 
 , 727-30,
 
 330 P.3d 551
 
 (2014), modified on other grounds,
 
 356 Or. 687
 
 ,
 
 343 P.3d 634
 
 , cert. denied, --- U.S. ----,
 
 136 S.Ct. 230
 
 ,
 
 193 L.Ed.2d 173
 
 (2015). Second, the court could prohibit all first time in-court identifications, except for good reason, an approach that the Supreme Judicial Court of Massachusetts adopted in
 
 Commonwealth v. Crayton,
 

 470 Mass. 228
 
 , 241-42,
 
 21 N.E.3d 157
 
 (2014), and
 
 Commonwealth v. Collins,
 

 470 Mass. 255
 
 , 261-62,
 
 21 N.E.3d 528
 
 (2014). Third, the court could review the reliability of first time in-court identifications using the factors that social science has identified as influencing the reliability of eyewitness identifications generally (system variables and estimator variables); see, e.g.,
 
 State v. Guilbert,
 
 supra,
 
 306 Conn. at
 
 236 n. 11,
 
 49 A.3d 705
 
 ; or the court could apply the factors set forth in
 
 Neil v. Biggers,
 

 409 U.S. 188
 
 , 199-200,
 
 93 S.Ct. 375
 
 ,
 
 34 L.Ed.2d 401
 
 (1972), as it does when an identification follows an unnecessarily suggestive out-of-court identification procedure. Rather than adopt one of the tests that the defendant has presented, the majority decides to craft its own rule for prescreening the reliability of first time in-court identifications.
 

 Without addressing the doctrine of stare decisis, the majority overrules two of this court's previous decisions. First, the majority overrules
 
 State v. Smith,
 
 supra,
 
 200 Conn. at 469-70
 
 ,
 
 512 A.2d 189
 
 , insofar as it holds that an in-court identification will be excluded only when it follows an unnecessarily suggestive out-of-court identification that is conducive to irreparable misidentification. See footnote 5 of the majority opinion. Second, the majority overrules this court's holding in
 
 State v. Tatum,
 

 219 Conn. 721
 
 ,
 
 595 A.2d 322
 
 (1991), that a first time in-court identification during a probable cause hearing is not unnecessarily suggestive because, "[i]n order to try [a] defendant, it [is] necessary for the prosecution to present evidence at the preliminary hearing to establish probable cause to believe that [the defendant] ... committed the crimes charged." (Emphasis omitted.) Id., at 728,
 
 595 A.2d 322
 
 ; see part II of the majority opinion. I am troubled by the majority's decision to overrule these cases without first balancing the reliance interests that will be disturbed by overruling these cases against the costs of adhering to the holdings in
 
 Smith
 
 and
 
 Tatum
 
 in order to determine whether the dictates of stare decisis justify overruling those cases. See
 
 State v. Peeler,
 

 321 Conn. 375
 
 , 469-70,
 
 140 A.3d 811
 
 (2016) (
 
 Zarella, J.,
 
 dissenting). By failing to address the principle of stare decisis, the majority creates the appearance that stare decisis is nothing more than "a doctrine of convenience" and that our determination of whether to adhere to the doctrine is "determined by the needs of the moment...." (Internal quotation marks omitted.)
 
 Id.,
 
 at 440 n. 5 (
 
 Zarella, J.,
 
 dissenting), quoting C. Cooper, "Stare Decisis: Precedent and Principle in Constitutional Adjudication,"
 
 73 Cornell L.Rev. 401
 
 , 402 (1988).
 

 As the thirteenth, fourteenth, and fifteenth amendments to the United States constitution make clear, when there is an intent to endow the government with power to create prophylactic constitutional rules or protections, the constitution so states. See U.S. Const. amend. XIII, § 2 ("Congress shall have power to enforce this article by appropriate legislation"); U.S. Const. amend. XIV, § 5 ("[t]he Congress shall have power to enforce, by appropriate legislation, the provisions of this article"); U.S. Const. amend. XV, § 2 ("[t]he Congress shall have power to enforce this article by appropriate legislation"). Thus, I suggest that no court, including this court, has the authority to craft such rules. See, e.g.,
 
 Dickerson v. United States,
 

 530 U.S. 428
 
 , 460,
 
 120 S.Ct. 2326
 
 ,
 
 147 L.Ed.2d 405
 
 (2000) (Scalia, J. dissenting) ("[when] the [c]onstitution has wished to lodge in one of the branches of the [f]ederal [g]overnment some limited power to supplement its guarantees, it has said so").
 

 A number of United States Supreme Court justices have voiced doubt concerning that court's authority to craft prophylactic rules. See, e.g.,
 
 Dickerson v. United States,
 

 530 U.S. 428
 
 , 446,
 
 120 S.Ct. 2326
 
 ,
 
 147 L.Ed.2d 405
 
 (2000) (Scalia, J., with whom Thomas, J., joins, dissenting) (if United States Supreme Court had prophylactic power "not merely to apply the [c]onstitution but to expand it," it would have "an immense and frightening antidemocratic power, and [that power]
 
 does not exist
 
 " [emphasis added] );
 
 id., at 457
 
 ,
 
 120 S.Ct. 2326
 
 (Scalia, J., with whom Thomas, J., joins, dissenting) (characterizing court's prophylactic power as "a lawless practice");
 
 Oregon v. Elstad,
 

 470 U.S. 298
 
 , 348,
 
 105 S.Ct. 1285
 
 ,
 
 84 L.Ed.2d 222
 
 (1985) (Brennan, J., with whom Marshall, J., joins, dissenting) (citing with approval conclusion in
 
 Michigan v. Tucker,
 

 417 U.S. 433
 
 ,
 
 94 S.Ct. 2357
 
 ,
 
 41 L.Ed.2d 182
 
 [ (1974) ], that court cannot craft prophylactic rules to support argument that violation of
 
 Miranda v. Arizona,
 

 384 U.S. 436
 
 ,
 
 86 S.Ct. 1602
 
 ,
 
 16 L.Ed.2d 694
 
 [ (1966) ], is violation of constitution);
 
 Oregon v. Elstad,
 

 supra, at 370-71
 
 ,
 
 105 S.Ct. 1285
 
 (Stevens, J., dissenting) (United States Supreme Court's "power to require state courts to exclude probative self-incriminatory statements rests entirely on the premise that the use of such evidence violates the [f]ederal [c]onstitution.... [Thus, if a violation of
 
 Miranda
 
 is not necessarily a violation of the constitution, the court] must regard the holding in the
 
 Miranda
 
 case itself, as well as all of the federal jurisprudence that has evolved from that decision, as nothing more than an illegitimate exercise of raw judicial power." [Footnote omitted.] );
 
 Michigan v. Tucker,
 

 supra, at 462-63
 
 ,
 
 94 S.Ct. 2357
 
 (Douglas, J., dissenting) ("The [c]ourt is not free to prescribe preferred modes of interrogation absent a constitutional basis. [The court] held the requirement of warnings and waiver of rights [to be] fundamental with respect to the [f]ifth [a]mendment privilege ... and without so holding we would have been powerless to reverse [the] conviction [in
 
 Miranda
 
 ]." [Citation omitted; internal quotation marks omitted.] );
 
 Michigan v. Tucker,
 

 supra, at 465-66
 
 ,
 
 94 S.Ct. 2357
 
 (Douglas, J., dissenting) ("
 
 Miranda
 
 's purpose was not [the] promulgation of judicially preferred standards for police interrogation, a function we are quite powerless to perform");
 
 North Carolina v. Pearce,
 

 395 U.S. 711
 
 , 741,
 
 89 S.Ct. 2072
 
 ,
 
 23 L.Ed.2d 656
 
 (1969) (Black, J., concurring in part and dissenting in part) (agreeing that due process prohibits imposition of harsher sentence on defendant who successfully appeals conviction but who again is convicted after new trial merely to punish defendant for taking appeal, but arguing that court was "not vested with any general power to prescribe particular devices [for example, requiring sentencing judge to state reasons for more serve punishment affirmatively or requiring factual data supporting such reasons to be made part of the record] [i]n order to [en]sure the absence of such a motivation.... This is pure legislation if there ever was legislation." [Internal quotation marks omitted.] ), overruled in part on other grounds by
 
 Alabama v. Smith,
 

 490 U.S. 794
 
 ,
 
 109 S.Ct. 2201
 
 ,
 
 104 L.Ed.2d 865
 
 (1989). If there is question regarding the United States Supreme Court's authority to craft prophylactic constitutional rules, then, surely, it is not obvious that
 
 this court
 
 has such authority.